1         UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF PENNSYLVANIA
2

3    UNITED STATES OF AMERICA      )    5:13-cr-00328-JKG-1
                                  )    March 13, 2015
4    vs.                          )
                                  )    2:35 p.m.-5:28 p.m.
5    LOUAY SHAMAN                  )    Philadelphia, PA

6                  SENTENCING HEARING
        BEFORE THE HONORABLE JAMES KNOLL GARDNER
7            UNITED STATES DISCTRICT JUDGE
    APPEARANCES:
8

    For the Government:        ALBERT S. GLENN, ESQ.
9                              KAREN FOX, ESQ.
                              U.S. Department of Justice
10                             615 Chestnut Street
                              Suite 1250
11                             Philadelphia, PA  19103

12   For Defendant:            DAVID SCOTT NENNER, ESQ.
                              ATTORNEY AT LAW
13                             1500 JFK Blvd.
                              Suite 620
14                             Philadelphia, PA  19102

15   ESR Operator:             JUSTIN WOOD

16

17

18

19

20

21

22

23           Veritext National Court Reporting Company
                     Mid-Atlantic Region
              1801 Market Street - Suite 1800
24                 Philadelphia, PA 19103
                     1-888-777-6690

25

1                    E X H I B I T S

2    NO.                                    RECEIVED

3    Defendant's:

4    A-K                                        12

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

(Call to Court)
2

THE COURT:  Good afternoon, ladies and
3

gentlemen.
4

ALL:  Good afternoon, Your Honor.
5

THE COURT:  The matter before the Court
6

this afternoon is the second day of a sentence hearing
7

in the case of United States of America versus Louay
8

Shaman, Case No. 13-cr-00328.
9

I note the presence of the persons who
10

were present on the first day of this sentence hearing
11

two days ago, March 10, 2015, and that is representing
12

the Government, Assistant United States Elbert S.
13

Glenn.  Good afternoon, Attorney Glenn.
14

MR. GLENN:  Good afternoon, Your Honor.
15

THE COURT:  And is Special Agent Smith
16

here today?  There he is, Special Agent William G.
17

Smith of the Federal Bureau of Investigation.  And is
18

Detective Nicoletti here today?
19

DETECTIVE NICOLETTI:  Yes, Judge.
20

THE COURT:  There he is.  Detective
21

Thomas J. Nicoletti of the Upper Saucon Police
22

Department.
23

I also note the presence of privately
24

retained defense counsel, David Scott Nenner.
25

1    MR. NENNER:  Good afternoon, sir.

2    THE COURT:  Good afternoon, Attorney

3  Nenner.  And with him is his client, the Defendant,

4  Louay Shaman.

5    THE DEFENDANT:  Good afternoon, Your

6  Honor.

7    THE COURT:  Good afternoon, Mr. Shaman.

8    Now, although Mr. Shaman was sworn in

9  on Monday, we will swear him in again since there's

10  been a break in the action.  You may swear the

11  defendant.

12    THE CLERK:  Please rise, please raise

13  your right hand.

14    (Defendant sworn)

15    THE COURT:  Please be seated.  In

16  addition to the documents which I mentioned on the

17  record as having received and reviewed, on the first

18  day of this hearing, since that time, I received from

19  the defendant a motion for downward departure and/or

20  downward variance and sentencing memorandum.  The

21  motion is undated, but the certificate of service is

22  dated March 11, 2015.  And the document was filed

23  together with Exhibits A through I on March 11, 2015

24  as Document 72 in this matter.

25    Exhibit A is a letter dated February

1    10, 2015 from defense counsel, Attorney Nenner, to

2    Senior United States Probation Officer Leslie E.

3    Maxwell, who is also here.  Good afternoon --

4              MS. MAXWELL:  Good afternoon, Your

5    Honor.

6              THE COURT:  And Exhibit A -- strike

7    that.

8              Exhibit B to the defendant's motion is

9    a -- some documents from Dr. Robert Sozzi, S-o-z-z-i,

10    M.D., a psychiatrist with Psychiatry Consultants,

11    P.A.; P.A. standing for Professional Association.  And

12    there are two notes on the psychiatric visits with the

13    defendant dated March 19, 2012, and February 20, 2012,

14    together with an initial psychiatric evaluation dated

15    February 13, 2012.  Those things are all included in

16    Exhibit B.

17              In Exhibit C, it is a copy of an

18    agreement to proffer facts in lieu of live testimony,

19    an agreement between the Government and the defendant

20    dated February 24, 2015.

21              Exhibit D is an untitled document that

22    has a silhouette of the back of a female from

23    shoulders up which was described in a little more

24    detail by me on the record on day one of the

25    sentencing hearing on March 10th.

1          Exhibit E is a four-paged untitled

2   document dated March 3, 2012 from Facebook with small

3   square pictures of someone named Louie Oudet, L-o-u-i-

4   e, last name O-u-d-e-t, which I describe on the record

5   in more detail on day one of the sentence hearing.

6          Exhibit F is a 13-paged document

7   entitled victim's phone records from March 2nd through

8   March 4th, 2012, which I described on the record on

9   the first day of the sentence.

10          Exhibit B -- I mean, Exhibit G consists

11   of six pages numbered pages 61 to 66 of an AT&T,

12   standing for American Telephone & Telegraph Company,

13   proprietary mobility usage records with a run date of

14   April 11, 2013 including telephone records for March

15   3, 4, and 5 of 2012 for telephone number area code

16   201, 993-0115 as described on the record by me on day

17   one of this sentence hearing.

18          Exhibit H is a document entitled

19   summary chart dated March 4 and 5 of 2012 concerning

20   text communications and voice telephonic

21   communications.

22          Exhibit I is a letter dated February

23   17, 2015 from Assistant United States Attorney, Albert

24   S. Glenn to defense counsel, Attorney David S. Nenner

25   concerning a summary of the interview of the minor

1    victim in this case, which interview occurred on June

2    5, 2013.

3                   As required by Federal Rule of Criminal

4    Procedure 31(i)(1)(A) I will ask defense -- I will ask

5    Government counsel whether he has received a copy of

6    defendant's motion and the exhibits which I have just

7    enumerated.

8                   MR. GLENN:  Yes, Your Honor, I did

9    receive those.

10                  THE COURT:  Very well.  The addendum to

11   the presentence report, which the presentence report

12   is dated January 29, 2015 and which report was revised

13   and updated on February 27, 2015.  The addendum is

14   incorporated into the presentence report as page 18,

15   and it is also dated February 27, 2015.

16                  And it indicates in certain paragraph

17   numbers in the original presentence report were

18   revised and updated.  And it all indicates as was

19   stated on the record on the first day of the hearing,

20   that the Government and defense have no unresolved

21   objections to the presentence report.  And both

22   counsel affirmed that on the record on March 10th,

23   2015.

24                  We'll treat the -- we'll address and

25   deal with the motion for downward departure and/or

1    downward variance of the defense as part of the

2    sentencing hearing during which hearing, and at the

3    end of which hearing, right before we impose sentence,

4    each counsel will have an opportunity to make

5    sentencing statements or sentencing arguments to me,

6    and that during those arguments, the defendant can

7    argue in favor of his motions for downward departure

8    or variance.  And the Government may argue its

9    position concerning those defense motions as well.

10              Mr. Nenner, does the defendant have any

11    witnesses to present at the sentence hearing today?

12              MR. NENNER:  No witnesses, Your Honor.

13    People are here in support of him, but they do not

14    wish to testify.

15              THE COURT:  Very well.  Will your

16    client be exercising his right of allocution?

17              MR. NENNER:  Yes.

18              THE COURT:  All right.  Mr. Glenn, will

19    the Government be presenting any sentencing witnesses

20    today?

21              MR. GLENN:  No, Your Honor, we will

22    not.

23              THE COURT:  Okay.  Very well.  Will the

24    Government be presenting any sentencing exhibits

25    today?

1          MR. GLENN:  I don't believe so unless

2    something comes up during the course of argument which

3    requires that.

4          THE COURT:  All right.  Mr. Nenner, in

5    addition to the nine exhibits which I've already

6    identified, and which were attached to your motion,

7    does the defendant have any additional exhibits to

8    offer today?

9          MR. NENNER:  Yes, sir.

10          THE COURT:  And what would they be?

11          MR. NENNER:  Judge, the first exhibits

12    that I would intend to offer, and I've already handed

13    a copy to the Government would be prison records

14    concerning my client's medical condition and

15    treatment.  The reason that it was not attached to the

16    presentence memorandum was because I felt it was

17    prudent to have my client's signature and

18    authorization to allow him to share those records with

19    both the Court and the Government before I actually

20    did.

21          I realize that it was handed up to Your

22    Honor the other day, but I received it at the time I

23    handed it to you, and then thought about it a little

24    more and thought that I should have the written

25    authorization because of the nature of those records.

1    THE COURT:  And we marked those records

2    as Defense Exhibit J?

3    MR. NENNER:  That's fine, sir, with the

4    Court's permission.

5    THE COURT:  Okay.

6    MR. NENNER:  And then the other thing

7    is, or the last thing, Your Honor, is I sent yesterday

8    afternoon, and I did the Government with the record, a

9    statement that was taken from the FBI from the

10   victim's biological mother.  And I did fax that to the

11   Court.  I don't know if the Court received it,

12   hopefully they did.  If not, I do have another copy

13   here for the Court, that's redacted.

14   THE COURT:  All right.  May I see my

15   law clerk?

16   (Pause)

17   THE COURT:  We got nothing in addition

18   to your motion and memorandum and exhibits from your

19   office, although I believe my law clerk had a

20   telephone conversation with your secretary about

21   faxes, and your secretary indicated to my law clerk

22   that your fax machine had jammed, and she couldn't fax

23   anything to us.  And so we got no fax.

24   MR. NENNER:  Okay.  I apologize for

25   that, Your Honor.  I have a fax cover sheet, can I

1       approach and hand it to you?

2                    THE COURT:  Yes, you may.  First, I'd

3       like you to hand the letter -- I'm sorry, the prison

4       records and medical treatment records of the defendant

5       to the court reporter, and we'll ask him to mark them

6       as Defendant's Exhibit J.

7                    MR. NENNER:  May I approach, Judge?

8                    THE COURT:  Yes, please.  And let him

9       mark that and then we'll proceed.  But just stand

10      there for a minute, Mr. Nenner.

11         (Pause)

12                   THE COURT:  Now, the other thing I

13      believe you have, Mr. Nenner, is a statement taken by

14      the FBI from the victim's biological mother?

15                   MR. NENNER:  Yes, sir.  Just for the

16      record, the date of that statement is July 31st, 2013.

17                   THE COURT:  Okay.  And you want that

18      marked as Exhibit K?

19                   MR. NENNER:  Please.

20                   THE COURT:  All right.  We'll ask the

21      court reporter to mark the FBI statement as Defense

22      Exhibit K, then you may have a seat.

23                   MR. NENNER:  Yes, sir.

24                   THE COURT:  And then we'll ask the

25      reporter to hand the last two exhibits up to me.

1          Now, Attorney Nenner, are you offering

2  Defense Exhibits A through K into evidence?

3          MR. NENNER:  Yes, sir, with the Court's

4  permission.

5          THE COURT:  Any objection from the

6  Government?

7          MR. GLENN:  No objection, Your Honor.

8          THE COURT:  In the absence of

9  objection, Defense Exhibits A through K are received

10  into evidence.

11     (Defense Exhibits A through K received)

12          THE COURT:  I believe I asked defense

13  counsel at the first hearing whether he had received a

14  copy of the presentence report on the record on the

15  first day of this hearing, and defense counsel

16  indicated that he had.  Is that correct, Mr. Nenner,

17  you've received the presentence report?

18          MR. NENNER:  I did, sir.

19          THE COURT:  And did you discuss the

20  presentence report with your client, the defendant, on

21  a timely basis?

22          MR. NENNER:  Yes, Your Honor.

23          THE COURT:  And, Mr. Glenn, did the

24  Government receive the presentence report?

25          MR. GLENN:  Yes, Your Honor.

1          THE COURT:  Very well.  As it stands,

2     the presentence report shows a total guideline offense

3     level of 29, and a criminal history category of 1,

4     which yields a guideline sentencing range of 87 months

5     to 108 months.  I believe I mentioned that on the

6     first day of the hearing.

7               I think I also mentioned as a result of

8     the plea agreement between the Government and the

9     defense, the Government has agreed to dismiss Counts I

10    and II of the indictment which has been replaced with

11    a one count supplemental information and the defendant

12    is pleading to that one count supplemental information

13    in this matter.

14               And the indictment, if it had not been

15    dismissed, would have carried a mandatory minimum of

16    ten year's incarceration concerning Count II of the

17    indictment.  But because the Government is going to

18    dismiss that indictment, there is no mandatory minimum

19    statutory sentence of incarceration in this matter,

20    although there is a mandatory minimum remaining

21    concerning supervised release.  That would be a five

22    year or 16 month mandatory minimum period of

23    supervised release up to a lifetime of supervised

24    release that is applicable to the sentence of Mr.

25    Shaman.

1    I noted on the first day of the hearing

2    under Federal Rule of Criminal Procedure 23(f)(1) that

3    no objections were filed, as I've already stated a few

4    moments ago.

5    Therefore, I will give defense counsel

6    and the defendant each an opportunity to be heard to

7    comment on the presentence report and present

8    testimony or information of any type, and the

9    defendant will be permitted to exercise his right of

10   allocution.  Other than the allocution part, I will

11   give the Government the same opportunity, that is to

12   be heard to comment on the presentence report and

13   present testimony or information of any type.

14   But initially I want to conduct a

15   colloquy with the defendant.  Mr. Shaman, do you

16   understand that you have the right to remain silent at

17   this hearing.  You don't have to say or do or present

18   anything.  The only thing you have to do is answer my

19   questions truthfully.  Do you understand that?

20   THE DEFENDANT:  Yes, Your Honor.

21   THE COURT:  Now, in addition -- and if

22   you exercise your right to remain silent, I won't hold

23   that against you in any way, because that is your

24   right, do you understand that?

25   THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  In addition to your right

2     to remain silent, however, you may if you wish testify

3     in this sentence hearing.  And if you testify, you

4     would do so from the witness stand, which is to my

5     right and to your left in this courtroom as we are

6     facing each other.  And you would testify under oath,

7     and you would testify in response to questions asked

8     of you by your attorney.

9          And then after your attorney's

10    examination of you was completed, the Government

11    attorney, Assistant United States Attorney Glenn could

12    ask you questions on cross-examination, that is, ask

13    you questions while you were still on the witness

14    stand and still under oath about your testimony.

15          Do you understand that?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  You may also call witnesses

18    in this hearing, whether or not you testify, to

19    testify to anything that might be relevant to the

20    matter of an appropriate sentence for you.  And they

21    too could be cross-examined by Government counsel.  Do

22    you understand that?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  In addition to that, you

25    may present exhibits, such as documents or other

1    objects to the Court, and as you heard, you have

2    already presented and offered into evidence 11

3    exhibits marked Defendant's Exhibits A through K,

4    which I have described on the record, but you could

5    indeed offer other exhibits as well if they were

6    relevant to sentencing here.  Do you understand those

7    things?

8                    THE DEFENDANT:  Yes, Your Honor.

9                    THE COURT:  Now, whether or not you

10   testify and whether or not you offer exhibits, you

11   would also have the right to make an informal

12   statement to the Court.  If you make such an informal

13   statement, you would do so not from the witness stand,

14   but from where you were seated at counsel table.

15                   You also would make your statement in

16   your own words, rather than in response to questions

17   from your attorney.  And ordinarily, if you make such

18   an informal statement, the Government lawyer would not

19   be permitted to cross-examine you on that informal

20   statement.  Do you understand that?

21                   THE DEFENDANT:  Yes, Your Honor.

22                   THE COURT:  We call such an informal

23   statement the defendant's right of allocution.  Now,

24   your attorney has told me that you do not wish to

25   testify formally from the witness stand; is that

1  correct?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  He also told me that you do

4  not wish to present witnesses today; is that correct?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  He told me that other than

7  the 11 witnesses -- exhibits you did present, that you

8  don't intend to present additional exhibits; is that

9  correct?

10            THE DEFENDANT:  Yes, Your Honor.

11            THE COURT:  But finally he told me, you

12  do wish to exercise your right of allocution.  That

13  is, you do wish to make an informal statement to the

14  Court before I decide on a sentence and impose

15  sentence; is that correct?

16            THE DEFENDANT:  Yes, Your Honor.

17            THE COURT:  All right.  Now, is the

18  time for you to make that statement.  Seated where you

19  are, tell me in your own words what you would like me

20  to hear and consider before I sentence you.

21            THE DEFENDANT:  Your Honor, I take full

22  responsibility for my horrible behavior.  I hate

23  myself for this.  I have a daughter now, and if

24  someone behaved toward my daughter as I did with this

25  young girl, I would not be able to deal with it.

1          This has ruined my life.  And I am

2     ashamed to no end.  And my conscious weigh on me like

3     a black cloud.  I hope I caused her no long damage

4     (sic).  I hope one day I can be forgiven by society

5     and myself.  I hope to get my life back on the path.

6          I hope to get my life back on the path.

7     I (indiscernible), thank you, Your Honor, for whatever

8     leniency you may grant me.

9          THE COURT:  All right.  Thank you.

10          All right.  Now, we've arrived at the

11     point in the proceedings where each lawyer will have

12     an opportunity to make a sentencing statement to me,

13     and we will hear first from defense counsel from the

14     podium, and then following Mr. Nenner's statement,

15     we'll hear from Government counsel, Assistant United

16     States Attorney Glenn from the podium.

17          You may approach the podium, Mr.

18     Nenner, and make defendant's sentencing statement.

19          MR. NENNER:  Yes, sir.  Before I get

20     into the statement itself and argument before the

21     Court, I would like permission just to put the names

22     on the record of family members who are here.

23          THE COURT:  You may do that.

24          MR. NENNER:  Thank you.  The first

25     individual here, Your Honor, and I'll ask them to

1      stand up as I say their name and then sit back down.

2                    THE COURT:  Okay.

3                    MR. NENNER:  Summer Shaman is my

4      client's wife.  It's a young lady that he met after

5      this incident, Your Honor, and married her, and as

6      Your Honor knows from the presentence report, he has

7      -- they have, I should say, a young child who's

8      approximately one and a half years old.

9                    In addition to his wife, Your Honor, I

10     have two of his sisters here, one is Eman Shaman (ph).

11                   THE COURT:  How do you spell Eman?

12                   MR. NENNER:  E-m-a-n.  And his second

13     sister is also here, and I'm not going to do justice

14     to her first name, so maybe I'll just spell it if

15     that's okay with the Court.

16                   THE COURT:  Go ahead.

17                   MR. NENNER:  K-h-o-l-o-u-d, Shaman.

18     And his brother-in-law is also --

19                   THE COURT:  I was still going --

20                   MR. NENNER:  Sure.

21                   THE COURT:  Okay.  You said the sisters

22     were here and would stand, I haven't seen a female

23     stand.

24                   MR. NENNER:  I'm sorry, Your Honor,

25     apparently they have babies and --

```
 1                    THE COURT:  Okay.  They're not in the

 2     courtroom at this time?

 3                    MR. NENNER:  They're not in the

 4     courtroom, I thought they were.

 5                    THE COURT:  Okay.

 6                    MR. NENNER:  They are outside the

 7     courtroom.

 8                    THE COURT:  Okay.  Now, is the other

 9     person, the brother-in-law, did you say?

10                    MR. NENNER:  Yes, he's the one that

11     just stood up, Your Honor.

12                    THE COURT:  Okay.

13                    MR. NENNER:  He's holding a baby in the

14     back of the room.

15                    THE COURT:  Right.  And his name is?

16                    MR. NENNER:  First name is, Ra'ed, it's

17     R-a-'-e-d and I'm going to spell the last name A-b-b-

18     i-r-m-a-i-l-e-h.

19                    THE COURT:  All right.  Thank you.

20                    MR. NENNER:  Yes, sir.

21                    Judge, let me start out by clarifying

22     something if I may, because I also had the opportunity

23     to read the Government's presentence report, or I

24     should say presentence memorandum which obviously

25     addressed some of the issues that I'm intending to
```

1    address to this Court right now.  And the first thing

2    I wanted to say to the Court that in no way, and I

3    want to make this abundantly clear is Mr. Shaman

4    trying to evade responsibility of this crime.  In

5    fact, it is Mr. Shaman who pled guilty before this

6    Court, thereby admitting responsibility for his crime.

7              It is also Mr. Shaman who agreed not to

8    compel a young victim to come into this courtroom, not

9    only to not testify at a trial, but also not to have

10   to appear today or the other day before this Court at

11   sentencing.

12             And his guilty plea, Your Honor, and

13   his offense is clearly an accurately set forth in the

14   plea agreement and his admissions before the Court at

15   the time he entered his plea to the Court.  And

16   there's no question that when he traveled to New

17   Jersey, which was supposed to be on a trip to South

18   Carolina eventually, that he had the intent to have

19   illicit sexual contact with this 14-year old girl,

20   there's no question about that.

21             And I'm not here to try to minimize

22   that, Your Honor.  But what I am here, I think it's

23   important that the Court understands this, is that the

24   Court should know all the facts, it should know the

25   totality of the circumstances of when this happened,

1    why it happened, and how it happened.

2                And this is the situation.  Mr. Shaman

3    committed a heinous crime, there's no question about

4    that, it was a 14-year old girl, but this 14-year old

5    girl, Your Honor, and I want to say this as politely

6    as I can was going on 30 years of age, to put it --

7    she's somebody who's beyond her numerable age of 14

8    years old.  And that's not said to excuse what Mr.

9    Shaman did.

10                Again, it's to help explain why this

11   trip to New Jersey occurred, and for the Court to have

12   the understanding of everything that happened.  And in

13   addition to her, we have her biological mother, Your

14   Honor, who was frankly a big part, a big part, a lot

15   more than what she admitted to the FBI, and I want to

16   talk about her statement to the FBI in a second, but

17   she was a big part of a conspiracy, if you'd like, or

18   an agreement between her and her biological daughter

19   to try to relocate her from outside of Allentown to

20   South Carolina.  And there's no question about that,

21   Your Honor.

22                And that's why all these phone records

23   and text records, and things I believe are important

24   for the Court to understand.  So let me start out by

25   saying that on March 3rd of 2012, before the victim

1    had computer chatroom contacts with my client, because

2    if you recall, if you read what I submitted, my client

3    had started to really communicate with her on, at

4    least from what I have, from -- on March 3rd, 2012.

5              But before those communications, the

6    victim in this case was also communicating, as she did

7    often frankly on a daily basis at all hours of the

8    morning, all hours of the day, was also communicating

9    with other individuals.

10             One of those individuals whose name I

11   will not -- again because I don't know her age, I

12   don't want to bring it up not knowing her age, but

13   there was a female who she communicated with, who at

14   least in her communications indicated that she had a

15   romantic interest in this female.

16             And March 3rd, 2012 at about 1:54 p.m.

17   and some seconds, and again, this is UTC time, and

18   this is before all these conversations with my client,

19   Mr. Shaman, the victim wrote to her, "I'm running away

20   to North Carolina." And that's a statement that

21   appears in one of the e-mails that the Government had

22   provided to me. And there's a lot of e-mails, Your

23   Honor.

24             So before she even begins to start

25   communicating in a chat room with my client, she

1    indicates that there's an interest on her part to run

2    away to South Carolina.  In addition, and Your Honor

3    has this, on March 2nd, 2012, the day before this,

4    there are a total of, I believe it's nine texts,

5    between the biological mother and the victim.

6              Now, obviously I can't tell you what

7    the content of that was, Your Honor, but what I can

8    tell you is that there's nine of them proceed in a day

9    where there's approximately 48 to 49 texts, and that's

10   -- and when I say preceding day, I mean March 4th of

11   2012 when the plans or the decision on how she was

12   going to be relocated started to come into a formal

13   plan.

14             Now, Your Honor, on March 4th of 2012,

15   which is the day that this victim was taken from or

16   left her home, I should say, and went to New Jersey,

17   as I said, there's 40, approximately 49 texts going

18   back and forth before the biological mother and the

19   victim.

20             What's significant about that is when

21   you read the biological mother's statement to the FBI,

22   she indicates that she had no texts with her daughter,

23   and that she -- and I think if I remember reading it

24   correctly she said something to the effect that she

25   was on a certain kind of plan, and she didn't want to

1    run up the bill, but the physical evidence in this

2    case, the phone records seem to defy that statement.

3              Again, I won't go through each

4    individual time, unless the Court asks me to what was

5    -- you know, when it was and what was said, but I

6    believe that's significant, the texts on the afternoon

7    and morning before the victim was picked up outside of

8    her house.

9              Now, there are also calls on March 4th

10   and these are actually telephone calls, voice calls

11   between Mr. Shaman and the victim, again on March 4th,

12   2012.  One as a -- and I said substantiated calls

13   because these are all calls that are in excess of five

14   minutes.  There was more than that, sir, but some of

15   them were so short, that I don't know that there was

16   actually contact, so I didn't want to represent to the

17   Court that there were.

18             The four calls that occurred on March

19   4th of 2012 were at 1:56 p.m., 4:00 p.m., 5:18 p.m.,

20   5:43 p.m.  Of most significance, Your Honor, when you

21   analyze the calls, is the timing of some of these

22   calls, which belie what the biological mother said to

23   the FBI.

24             There is a call actually between the

25   biological mother and my client, there's 19 total

1    calls on March 4th of 2012; again, between the

2    biological mother and my client.  At 6:16 p.m. on

3    March 4th, 2012 when my client was traveling from his

4    home town in New Jersey to outside of Allentown to

5    meet with the victim, there's a call that is almost an

6    hour long.

7             And my client, according to the police

8    reports, he meets up with the victim outside of her

9    house at 7:15 p.m. on that same date.  Our contention,

10   Your Honor, Mr. Shaman's contention is that during

11   that hour, he was talking to the biological mother

12   about a number of things.  One was her desire to have

13   my client assist her in bringing the victim to South

14   Carolina.  Two was a discussion about potential

15   compensation for doing that.

16            I note that the Government says that

17   they interviewed the biological mother and she denied

18   that.  Well, she denied a lot of stuff, and it turns

19   out not to be accurate compared to what the phone

20   records show us.

21            But in addition to that, there was

22   discussions about how my client was to assist in

23   transferring the victim to South Carolina.  There was

24   discussions about whether he was actually going to

25   drive there.  There were discussions about putting her

1 on a train in Newark, New Jersey.  There were all of

2 these discussions that went on.

3    Now, there's also telephone calls on

4 March 4th not only from the victim's family -- excuse

5 me, from the victim's phone, cell phone, but also from

6 my client's cell phone after she threw the phone out

7 of the window after police made notification to her

8 that they were looking for her.

9    There's a total of three calls on March

10 4th of 2012 to the victim's cell phone number.  And

11 again, because I do think it's important, the totality

12 of the circumstances here, we talked a little bit

13 about the calls from the mom to the client, I told you

14 there was a total of 19 calls.

15    Some of them actually occurred on March

16 5th of 2012, Your Honor, and this is another point

17 that I think is important for the Court to understand.

18 In the biological mother's statement, she made it

19 clear that she never initiated a telephone call to my

20 client on the evening or the early morning hours on

21 the day of March 5th, 2012.

22    Well, in fact, when you go through the

23 records to see the outgoing and incoming and where the

24 calls are coming from, there is at least three calls

25 that were initiated by the biological mother.  They

1    are on March 5th, 2012 at 5:17 a.m., this was a call

2    that lasted 8 minutes, 27 seconds.  There is another

3    call from the mother on March 5th, 2012 at 8:35 a.m.

4    for 33 seconds.  And then there's another one on March

5    5th, 2012 at 1:19 p.m. --

6                    THE COURT:  Well, 8:35 a.m. you said.

7                    MR. NENNER:  Yeah, 8:35 a.m.

8                    THE COURT:  Okay.  That was how many

9    seconds?

10                   MR. NENNER:  That was 33 seconds, sir.

11                   THE COURT:  Okay.  And then the third

12   one you said was what?

13                   MR. NENNER:  March 5th, 2012, another

14   call initiated by the biological mother at 1:19 p.m.

15   that lasted three minutes and 44 seconds.  Now,

16   they're only the calls that were initiated by the

17   biological mom.

18                   In addition to those calls, there are

19   calls on March 5th, 2012 that were initiated by my

20   client from his cell phone to the biological mom.  And

21   they're not long, so I'll give them to you, with the

22   Court's permission.

23                   March 5th, 2012 at 1:15 a.m., a call

24   that lasted 3 minutes, 50 seconds; March 5th, 2012 --

25                   THE COURT:  I'm sorry, what time was

1    that call?

2                     MR. NENNER:  1:15 a.m. in the morning.

3                     THE COURT:  And how long did you say it

4    lasted?

5                     MR. NENNER:  3 minutes, 50 seconds.

6                     The next call --

7                     THE COURT:  And these are calls from

8    the defendant to the victim's mother?

9                     MR. NENNER:  Yes, biological mother,

10   yes, sir.

11                    THE COURT:  Okay.

12                    MR. NENNER:  The next one was initiated

13   by Mr. Shaman to the biological mother, was March 5th,

14   2012 at 5:02 a.m. in the morning.

15                    Now, I can't tell the Court on those

16   particular two times who was talking to the biological

17   mother, in other words, because as I indicated the

18   victim's phone was thrown out the window earlier in

19   the evening, and clearly there were some conversations

20   between the victim and her biological mother utilizing

21   my client's cell phone.

22                    There's two more calls, sir.  One is --

23   excuse me, one more call.

24                    THE COURT:  And this a call also

25   initiated by the defendant to the victim's biological

1    mother?

2                    MR. NENNER:  Yes, Your Honor.

3                    THE COURT:  Okay.  Go ahead.

4                    MR. NENNER:  March 5th, 2012 at 5:48

5    p.m., and this was a call that lasted 22 minutes and

6    53 seconds.  This is after my client was released from

7    custody, after being interviewed by local law

8    enforcement.

9                    The reason that I think this is

10   important, if you look at the call at 8:35 a.m. there

11   is something in the mother's statement where she says

12   she actually overheard the police questioning Mr.

13   Shaman when he was being interviewed.  And what she

14   indicates is that my client contacted her, and I would

15   respectfully suggest to the Court, that given the

16   timing of the interview which happens sometime before

17   8 a.m., the call that -- the only call that I could

18   see that would relate to the time is the one at 8:35

19   a.m. for 33 seconds that we talked about, which was

20   initiated from the biological mother to my client.

21                   And my client has indicated to me that

22   she was on the phone and did contact him when he was

23   being interviewed by law enforcement.

24                   So I think that the phone records,

25   whether they're texts or they're actual voice calls,

1    clearly make out a situation much different than the

2    biological mother would have you believe.  And I think

3    that the young victim here clearly had contemplations

4    at least of leaving Allentown to go to her biological

5    mother as I indicated, well before my client became

6    involved in her, and I think that's substantiated, as

7    I said, by another text with another person that

8    occurred before the times she starts communicating

9    with my client.

10              Now, again, I'm not here to smear the

11    victim in this case, that's not my goal here, but I

12    have to respond, Your Honor, respectfully, to some of

13    the Government's accusations in their presentence

14    memorandum.

15              For instance, and I don't know what the

16    Government means by that, so I'm going to tread

17    carefully as they say, but the Government represents

18    that Mr. Shaman violated the sexual innocence of a 14-

19    year old girl, and that he accomplishes through

20    enticement using the internet.

21              Your Honor, my response to that is, I

22    don't know if that's true, and you don't know if

23    that's true, and let me say why I say that as

24    carefully as I can.  As I indicated to this Court,

25    there are numerous communications from this victim to

1    other individuals besides Mr. Shaman at the same time

2    period, I'm talking about on March 2nd, March 3rd and

3    after that, where she is having very explicit

4    conversations of a sexual nature to other individuals,

5    including females and males, Your Honor.

6             She indicates in some of those, and I

7    don't know if it's true, but this is her words, that

8    she was bisexual, she also indicated in one particular

9    text that during one of the summers or that summer at

10   summer camp, her and some other girls put on a sexual

11   display for the boys in the camp.

12            Now, I say that to the Court only in

13   response to the Government, when they indicate that

14   Mr. Shaman should be hit hard here, and should be hit

15   at the top level of the guidelines because of the

16   psychological damage he did to this 14-year old girl.

17            And my response to that is, I don't

18   know how we know that because we have never met her,

19   we have never heard from her.  There's nothing that

20   was ever disclosed to me in this process, that

21   indicated that she had any kind of psychological

22   damage from what happened.

23            Now, I think we can take for granted

24   that a 14-year old girl who has sexual contact with

25   somebody of 28 years of old, clearly that's going to

1    affect her, and clearly that's going to have

2    impressions upon her, and not good ones.  But to say

3    that he stole her innocence, given the language and

4    her communications with other people, and given things

5    that she claims she did, whether -- I can't attest to

6    whether they're true or not, I think it's a far leap

7    to say that he violated her sexual innocence.  I just

8    don't think the Court knows that.  And that's why I

9    responded to it.

10              As far as the enticement part, well

11   I'll leave that up to Your Honor.  There's a clear

12   indication in the first communications between Mr.

13   Shaman and this young victim that she was a

14   participant in at least the conversations.

15              She indicated that she liked to be

16   touched, she indicated that she liked to be touched

17   all over, she indicated that if she would let Mr.

18   Shaman, and that's her words, if I let you, I would

19   probably let you touch me all over.

20              That was her conversation within this

21   conversation.  And, Your Honor, I also think it's

22   important to realize that even though there's no doubt

23   that Mr. Shaman set out to have a physical sexual

24   contact with this girl, the part where I think it gets

25   a little vague and a little hazy as to what his intent

1   was as to where it would happen and how it would

2   happen.

3                Because I think if you read the first

4   day, and I'm talking about March 3rd, 2014, their

5   contacts with each other, it's clear that he was ready

6   to come to her, to her hometown to be with her.  It's

7   also clear from this case, with all due respect, that

8   the contact that ultimately occurred in this case,

9   occurred inside in his vehicle.

10               So I don't think you could look at the

11   facts here and say that it was so important for Mr.

12   Shaman to take her to New Jersey to accomplish this

13   illegal conduct.  Now, I know it happened that way.

14   But my point is simply that when I talk about a

15   downward variance, and the responsibility who caused

16   the internet -- the excuse me, interstate travel in

17   this case, I don't know how you could look at the

18   totality of the circumstances and say that the mother

19   and this -- and the young victim herself were clearly,

20   clearly had orchestrated this plan to get this victim

21   somehow to South Carolina.

22               And clearly while the victim had the

23   ability to say to Mr. Shaman on March 3rd that don't

24   come, I'm not going to see you, which he didn't come

25   and didn't see her, she certainly worked the next day,

1     if you look at the volume of these texts, and the

2     volumes of these calls to the biological mother, and

3     back and forth, clearly she had a plan and a motis

4     operandi to use Mr. Shaman to take her out of the

5     State of Pennsylvania to travel to South Carolina.

6               THE COURT:  You're talking about the

7     mother or the victim having a clear plan?

8               MR. NENNER:  I'm talking about both,

9     the biological mother, and I'm talking about the

10    victim.  And I think it bears out the victim because

11    of what she is texting before she's talking to my

12    client about what her intent is, which is to go live

13    with her biological mother.

14               It's also clear from her communications

15    with my client that she represented certain things to

16    him, I don't know if they're true or not, about her

17    relationship with her adoptive parents.  She said that

18    they were physically abusive to her, she hated them.

19    She indicated, as her biological mother did in her

20    statement to the FBI, that she was -- portrayed

21    herself to be a victim of her adoptive parents, and

22    all of these things, Your Honor, were communicated to

23    Mr. Shaman.

24               So it doesn't absolve him of his

25    conduct; however, when looking at an appropriate

1  sentence for that conduct, an appropriate sentence

2  that will punish him and protect society, but at the

3  same time realize that he was not the only person who

4  was involved in promoting the removal of this young

5  girl, I think the fairness is that these guidelines,

6  whether you start at the bottom or the top or

7  somewhere in the middle, overstate his criminal

8  conduct under these circumstances.

9          And I say that to the Court because I

10  tried to analyze it, as Your Honor knows, as a

11  situation which we commonly refer to as statutory

12  sexual assault, which is a crime obviously that he's

13  also guilty of, in terms of her age and things like

14  that.

15          However, statutory sexual assault does

16  not have the gravity in terms of sentencing as the

17  charge that he and this ultimate sentence he's going

18  to be punished for here today, it just doesn't.  If

19  you go to the state, it's an automatic five to ten

20  years, that's a mandatory for a first time offender.

21          I believe, if I calculate it correctly,

22  the guidelines in the federal system are actually a

23  little less.  I think they're like 48 months, even

24  with the enhancements for the computer and things like

25  that.

1    But having said that, Your Honor, I'm

2  just asking the Court to look at the total situation

3  here and understand that this interstate travel was

4  promoted by the victim as well as her biological

5  mother.

6    I'm also asking the Court and the

7  Government provided this before sentencing to me in a

8  letter, saying that the biological mother actually

9  promoted the sexual contact between my client and the

10  victim, in a letter where she -- where the victim told

11  the Government that her mother said to have sex with

12  Mr. Shaman.

13    You'll note from the mother's interview

14  with the FBI, that she denied that.  That she said,

15  oh, I never said that, I said something that older

16  guys would want that, okay.

17    So, you know, yes, Mr. Shaman is here

18  before this Court, he's very humbled, Your Honor, he

19  understands he's going to be punished, his family is

20  here, his wife's here, and they know, he knows when he

21  pled guilty that he was going to go to jail, there's

22  no question about that.

23    And as Your Honor aptly reminded me at

24  the time of the plea, because of the class of this

25  offense, Your Honor had no choice but to incarcerate

1    him immediately, and that's in fact what you did.  The

2    Court was courteous enough I believe to allow him to

3    take a day or two to get his affairs in order, and Mr.

4    Shaman does appreciate that as I do.

5                    But having said all that, when you look

6    again at all the parties who were involved here and

7    how this happened and the way it happened, and the

8    numerous calls for the mother or the victim, for that

9    matter, to suggest to this Court, well, we really

10   didn't have a plan, Mr. Shaman just picked me up and

11   took me to New Jersey, okay, and that's where it began

12   and end.  It defies logic, it defies the physical

13   evidence in this case.

14                    And the contradictions between the

15   mother's statement and the records that I've put into

16   -- that I've given to this Court clearly show a

17   different pattern of behavior, not only by the victim,

18   but by the biological mother.

19                    And I just think in fairness, and

20   that's what we're here about, a fair sentence and a

21   sentence that obviously solves or promotes the goals

22   of the federal sentencing guidelines, as well as the

23   Congress and the statute.

24                    I think it behooves the Court, with all

25   due respect, to take into account again the

1  overreaching, if you will, or the behavior, or the

2  pattern of conduct by another adult, meaning the

3  biological mother, and also by the victim who, in many

4  ways, acted like an adult.

5  So, Your Honor, again this is not about

6  asking you to, you know, let him walk out of the

7  courtroom.  He knows that's not going to happen.  It's

8  about an appropriate sentence given the circumstances

9  of this case.

10  Now, if I can shift gears for a second.

11  Mr. Shaman -- I also filed a motion for downward

12  variance as the Court knows, and I worded it basically

13  on his psychological issues, as well as some of the

14  things he's experienced in life himself.  And I know I

15  put it as a category, not one item, but it's the

16  totality of the items, Your Honor.

17  And what I want to say about that

18  initially, Your Honor, is that Mr. Shaman, as Your

19  Honor knows comes from age 12 to approximately I

20  believe it was 19 or 20, lived with his biological

21  father in the country of Jordan.  And he was exposed

22  to a lot of things which citizens of this country

23  often refer to as abusive behavior, as well as maybe

24  cultural norms that are not recognized here, and let

25  me highlight that.

1          He was -- when he went back to be with

2    his father, with his mother, and his siblings in

3    Jordan, it was not -- it was a very difficult

4    experience for him because his father, and I've

5    indicated to this Court, who was much older than his

6    mother, I believe his mother was in her young teens

7    when she married his biological father, obviously

8    underage by our standards, and also has a sister who's

9    not in the courtroom who was also given away, and I do

10   mean given away at a very young age, teenage years.

11          He was exposed to certain things that

12   left a horrible mark on him, and I say that because

13   his father was not -- was very physically abusive,

14   Your Honor.  His father used to lock him and his

15   siblings at times up in their house in Jordan for days

16   at a time.

17          At one point my client even went to the

18   American consulate to file a complaint.  My client

19   himself, Your Honor, as we often see in these types of

20   cases was also a victim of sexual abuse.  He was a

21   victim of sexual abuse from a cousin of his, as well

22   as his father's second wife.

23          And I should also point out to the

24   Court that his mother would often leave him and his

25   siblings with the father, in fact, she came back to

1       the United States before they did and left them there.

2       Ultimately, as I said, he came back when he was about

3       19 years of age.

4                    To sit here and say that, you know,

5       what occurred to him didn't have an impact on him and

6       a serious impact on him is just ignoring all the facts

7       in this case, and ignoring what he went through as a

8       child, young adolescence, before he even came back to

9       this country, you know, when he was again an older

10      teenager, 19 or 20 years of age.

11                   Your Honor, he certainly is an

12      individual -- he started his own business as Your

13      Honor knows, he was in the moving business.  One of

14      the businesses was a failure.  At the time he was

15      arrested in this case, he was actually doing pretty

16      well.  It was his business, he took on a wife, as I

17      described, and he had a child.  Obviously that

18      business is now defunct because of his situation and

19      where he is.

20                   I can tell you that his wife, Your

21      Honor, has suffered economically.  She's living with

22      her brother now with the child.  She is employed.  In

23      fact, she works for the New Jersey Correctional

24      Department.  But she has to have childcare, and as I

25      said, she doesn't have her own place to live and their

1        child also lives with a brother.

2               Your Honor, before this incident, Your

3        Honor, and again I want to be specific about the exact

4        date, before this incident, in -- on September 25th of

5        2011, Your Honor, Mr. Shaman was involved in a very

6        serious motor vehicle accident in the State of

7        Florida.  He was struck, his best friend was struck

8        who was killed, instantly killed, and this was while

9        they were moving items to the State of Florida from

10       the State of New Jersey.

11              That was -- that traumatized him.  He

12       feels a lot of guilt about that.  He clearly was

13       seeking treatment with a psychiatrist because of that

14       event, and because how it left him in terms of his

15       behavior.  He complains about headaches all the time,

16       you can see that from the prison records.  He's been

17       on and off medications.  A lot of them have not

18       worked.

19              The last time I saw him in

20       Philadelphia, one of his eyes was completely closed,

21       and he couldn't see out of it because of the effect of

22       one of the medications he was given at the prison.

23              One of the things that he has a concern

24       about and I do, and I ask the Court to fashion this in

25       your sentence, is that he gets appropriate medical

1    treatment wherever his ultimate destination is, Your

2    Honor.

3              Again, it's not one thing, it's a

4    combination of psychological trauma he suffered at a

5    young age, and the things he had to witness, and the

6    things he went through that he's asking the Court to

7    at least take that into consideration when fashioning

8    an appropriate sentence.

9              And I indicated to the Court that I

10   thought, Your Honor, this is just a lawyer obviously

11   being a zealous advocate for his client, I'm not

12   suggesting to you that 4 to 8 years is appropriate.  I

13   did that because it was somewhere in between the New

14   Jersey 5 to 10 mando, and what I believe the federal

15   guidelines would be for a statutory rape situation.

16             But what I am suggesting, and I will

17   leave it at this, Your Honor, that when you begin,

18   just look at everything that was involved and how this

19   crime occurred and what occurred.  And, you know,

20   really it comes down to, and I hate to say it like

21   this, it comes down to three people who used each

22   other for their own personal motives, their own

23   personal -- I'm at a loss for a word, but their own

24   personal concerns that the risk and expense of

25   everybody else, and that goes for Mr. Shaman too.

1          And again, I don't want to leave it

2    saying, I'm not here saying that, you know, he

3    deserves, you know, to walk out the door because he

4    didn't do anything that bad.  He did something awful,

5    okay, and he has a family that he should've known,

6    from his sisters -- his sister, excuse me, and his

7    mother, you know, that an 11-year old is a child,

8    whether it's this country or any other country, that's

9    just the facts.  And he should be punished for that.

10          And I say this with all, you know, my

11   deepest, my deepest impassioned way that I can do

12   that, Your Honor, and ask you to at least fashion a

13   sentence that under the circumstances of this case

14   meet all the sentencing goals and show a fairness not

15   only to society, and not only to the victim in this

16   case, but a fairness to Mr. Shaman, given how this

17   unfolded, Your Honor.  Thank you, sir.

18          May I step back?

19   (Pause)

20          THE COURT:  All right.

21   (Pause)

22          THE COURT:  Are you finished with your

23   sentencing statement, Mr. Nenner?

24          MR. NENNER:  I certainly am, Your

25   Honor, I hope you were able to hear it.

1          THE COURT:  I heard it.

2          MR. NENNER:  Thank you.

3          THE COURT:  All of it.  All right.  If

4    the defense is through, Government counsel may

5    approach the podium and make the Government's

6    sentencing statement.

7          MR. GLENN:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MR. GLENN:  First, we appreciate the

10   fact that there are family members here supporting Mr.

11   Shaman, and we think that's important for any

12   defendant to have the support of family here.

13          I'd like to address several of the

14   points that Mr. Neman raised during -- I'm sorry, Mr.

15   Nenner raised during his arguments, Your Honor.

16          Mr. Nenner's first point and argument

17   was for a downward departure.  The downward departure

18   would be under Section 5(k) 2.10, I believe and which

19   refers to the victim contributing to the offense here.

20          I'd like to suggest to the Court, Your

21   Honor, that this is not applicable, this departure

22   guideline that Mr. Nenner has set out in his plea memo

23   and argued today.  The guideline itself talks about a

24   victim's wrongful conduct, which contributed to the

25   offense.

1          I would first suggest to Your Honor

2     that there really isn't wrongful conduct here by the

3     victim toward Mr. Shaman.  The guideline itself is

4     generally conceived and applied for acts of violence

5     when a defendant may have a defense, a self-defense

6     type defense, saying he was provoked or some

7     circumstance that the victim did caused him to do that

8     act.

9          And the guideline itself says that

10    generally that this will not be applicable in non-

11    violent offenses.  Obviously, I don't think Mr. Shaman

12    is claiming that his sexual acts here were caused by

13    the victim, rather he is making a larger argument

14    concerning the overall conduct of the victim and the

15    biological mother because of the victim's desire to

16    leave her adoptive parents.

17          So really the guideline just really

18    doesn't apply.  The considerations the Court is

19    supposed to take into account include the size and

20    strength of the victim, and other physical

21    characteristics compared with the defendant, the

22    persistence of the victim's conduct and efforts by the

23    defendant to prevent confrontation, the danger

24    reasonably perceived by the defendant, including the

25    victim's reputation for violence, the danger actually

1   presented by the defendant -- to the defendant by the

2   victim, other relevant conduct by the victim that

3   contributed to the danger presented, and the

4   proportionately and reasonableness of the defendant's

5   response to the victim's provocation.

6         The guideline itself says it will

7   usually not be relevant in non-violent offenses, and

8   say it will ordinarily not be sufficient toward

9   application in a certain guideline which are criminal

10   sexual abuse guidelines.  Now, those aren't the

11   guidelines we're applying here, but I suggest that the

12   intent behind that is that when there's a criminal

13   sexual offense as we have here, this is not a

14   guideline to use.

15         So in the first instance, Your Honor,

16   we would argue that it's just simply not an applicable

17   guideline and the Court should reject the defendant's

18   request for a departure and deny that motion.

19         Now, with respect to whether this is

20   mitigating the question of mitigation is, of course, a

21   significant portion of Mr. Nenner's argument.  I would

22   suggest to Your Honor that it really is not mitigating

23   here.

24         This has a sound of the defendant

25   blaming the victim for the crime that he committed.

1    We appreciate the fact that the defendant accepts his

2    responsibility here for the sexual abuse of the minor

3    victim, and that's very important, and important for

4    the Court's consideration in sentencing.

5              The defendant has been given three

6    levels off of his guideline range in recognition of

7    his acceptance of responsibility.  But here, the

8    defendant is claiming that because -- and Mr. Nenner

9    spent a great deal of time talking about the

10   biological mother, her phone calls with Mr. Shaman,

11   the calls between the victim and the biological

12   mother.

13             We agree, Your Honor, that at that

14   time, this young 14-year old teenager had a desire to

15   leave her parents, her adoptive parents.  But I think

16   the -- I think it's important to understand that in

17   the context that she's 14 years old, and just 14.  Her

18   birthday was just the month before this.

19             She's just 14, a young teenager, and

20   seems to have some disagreement with her parents.  Is

21   that unusual?  I suggest not.  She happens to have a

22   biological mother who lives in South Carolina.  She

23   sees that as an avenue away from her parents, who seem

24   to be imposing some level of discipline or control

25   that she doesn't seem to think she any longer needs in

 1    her life.

 2              So she's seeking to go there.  Her

 3    biological mother, for whatever reasons, is not

 4    discouraging this.  But, Your Honor, this is a

 5    circumstance that Mr. Shaman takes advantage of.  He's

 6    interested in this minor victim for sexual reasons.

 7              He first comes upon her on a dating

 8    site, a dating site being one where you look for some

 9    romantic interaction.  Now, granted, she represented

10    she was 21 on that site in her profile; however, she

11    soon told the defendant that she was 14, and one of

12    the early conversations is the one we have the

13    transcript of from Facebook on March 3rd.

14              And one of the first thing she types on

15    that evening is, "You know I'm 14, right?"  This

16    doesn't dissuade Mr. Shaman and he continues in his

17    conversation.

18              Mr. Nenner talked about the back and

19    forth about being touchy.  Well, Mr. Shaman was the

20    one who initiated that line of conversation.  He's the

21    one who starts by saying, "So you like to be touched

22    and you're a touchy person," at line 22.  And there's

23    a back and forth on this, but he says that "I'm touchy

24    too."  He asks, "Where do you like to be touched at,"

25    and he says, "I'm sure you will let me touch you

1    everywhere."

2              Now, she has responses, which she's

3    somewhat flirting with him, true, but he continues to

4    press that point indicating his interest, what he

5    wants to do from the very beginning.

6              It's true, the victim had a desire to

7    leave her parents and go to South Carolina.  Mr.

8    Shaman takes advantage of this.  He uses this to his

9    own purpose.  In that March 3rd conversation, the

10   defendant declined -- I'm sorry, the victim declined

11   to have Mr. Shaman come over to her house.

12             Although he tried a number of times to

13   persuade her to do that.  He said in that

14   conversation, "And I'm coming to you now LOL," at line

15   20, "I swear I will take you if you want me to," line

16   24, "I'll come now if you want me to," line 29, "Do

17   you want me to come get you now?" line 33, "I'm not

18   joking, I'll come," line 37, "What's your address and

19   I'm come now," lines 42, "I'm talking for real, I

20   ain't playing, I'll come get you, you ready?"  And

21   "What you going to tell your parents?"

22             So he's the one who's pushing to see

23   here.  And she says no, she says no that night.  But

24   what changes between that night and Sunday night,

25   March 4th, when he does go to get her, this plan to go

1    to South Carolina.

2            This is the way that the defendant

3    manages to get the defendant (sic) out of his house

4    and into her car.  He speaks with her, he speaks with

5    the birth mother, he goes along with this plan.  He

6    takes advantage of the plan that she -- the victim has

7    to go to South Carolina and uses it to his advantage,

8    by agreeing to be of some service and going to South

9    Carolina, taking the victim there.  He gets her into

10   his car and he takes her to New Jersey.

11           So, Your Honor, the fact that the

12   victim and the birth mother were talking about the

13   victim going to South Carolina to satisfy the victim's

14   desire to have, what she thought, might be a better

15   place to live, is not something that's wrongful

16   conduct, it's not something that was wrongful as to

17   Mr. Shaman, it didn't hurt him one way or the other.

18   It was something he took advantage of.  And there's

19   really no mitigation to that.

20           There's nothing in that circumstance to

21   mitigate the offense that Mr. Shaman has committed

22   here.  So I think it's really not -- it seems that Mr.

23   Shaman, in some sense, is blaming the victim for the

24   offense, although he does take responsibility, and we

25   believe there's no mitigation in anything related to

1    the victim and the birth mother discussing a trip to

2    South Carolina.  We think that's just simply

3    irrelevant in any mitigation.  And, in fact, is

4    somewhat aggravating as to Mr. Shaman because of his

5    taking advantage of these circumstances with this

6    young 14-year old girl.

7                    Now, I'd like to address the question

8    of sentencing.  The Government recommends a sentence

9    within the guideline range and we recommend one at the

10   higher end of the guideline range, Your Honor.

11                   We do this because of the facts and

12   circumstances of this case.  The defendant has

13   admitted his -- that when he left New Jersey to go to

14   Pennsylvania to pick up the victim that night, he did

15   so with the intent to have sex with her, that when he

16   picked her up in Pennsylvania and took her back to New

17   Jersey, he did that with the intent to have sex with

18   her.

19                   And he's admitted the crime here.  He's

20   admitted that he kissed her, he fondled her, he

21   digitally penetrated her, he had sex with her, and

22   this also resulted in some physical injuries to the

23   victim.

24                   The medical examination of the victim

25   after the incident showed that she had abrasions and

1    bruises.  And those are -- and that's another factor

2    for the Court to consider.

3              This is a victim who during her

4    examination told the medical personnel that she'd

5    never had sex before prior to Mr. Shaman.  She told

6    Mr. Shaman -- well, let me step back.  She told the

7    police in the interview immediately after the incident

8    that she told Mr. Shaman that she didn't want to have

9    sex, that making out was okay, but the sex part was

10   not, and that she didn't want to do that.

11   Nonetheless, she did it anyway.

12             So these are significant factors and

13   it's a serious offense.  Mr. Nenner recognized it as a

14   heinous offense and we agree with that.  When we said

15   in our sentencing memo that the defendant took her

16   sexual innocence, but really speaking that he took her

17   virginity.  She had not had sex before, and her first

18   sexual experience with sex was in the back seat of a

19   car with a man who had taken her from her house, and

20   she didn't want to do it.

21             So, Your Honor, these are very serious

22   charges that Mr. Shaman has pleaded guilty to.  And

23   under the circumstances of this case, where she is a

24   14-year old girl, just turned 14, and he was 29 at the

25   time, and takes -- and does all this.  She's 14 years

1    old and he took advantage of this young girl who

2    wanted to run away from home and took her to New

3    Jersey.

4                Now, New Jersey makes sense for Mr.

5    Shaman to take her there.  That's where he's from, he

6    was born there, he's lived there most of his life, he

7    knows New Jersey.  To the extent he's going to find a

8    place where he feels comfortable having sex in a car

9    with her, New Jersey makes more sense.  So there are

10   -- there certainly is a reason for him to have taken

11   her there in order to have sex with her.

12               So, Your Honor, in conclusion I would

13   say that I think I've responded to the -- oh, no, not

14   completely.  Let me also address the questions that

15   Mr. Nenner has raised concerning Mr. Shaman's

16   psychological matters.

17               Mr. Nenner has identified certain

18   factors and so has the presentence report concerning

19   circumstances which occurred during Mr. Shaman's

20   childhood and teenage years, and also the automobile

21   accident which occurred about 18 months before this

22   incident.  And we recognize those certainly could have

23   some effect on Mr. Shaman.

24               What the Court should look at, however,

25   Your Honor, is Mr. Shaman's abilities and condition on

1    the night of the offense.  When he went to

2    Pennsylvania and picked up the victim and took her

3    back to New Jersey, at that time, as Mr. Nenner has

4    said, he was the owner and operator of a successful

5    and income producing moving company.  He was fully

6    employed, he was running the company, he had

7    employees.  He was showing that he was pretty capable

8    in the world.

9              He also was able to engage in these

10   discussions with the victim and her birth mother

11   concerning a plan that he took advantage of to help

12   her go to South Carolina.  That shows a significant

13   amount of capability and ability to manipulate and to

14   use the circumstances to his advantage.

15             So we would suggest that those indicate

16   that while these other issues may affect him long-

17   term, on the night of the incident, he was functioning

18   quite well.  And sufficiently well that these other

19   circumstances should not have significant mitigation

20   in the Court's sentencing.

21             We have no objection, of course, to the

22   Court recommending that the defendant get medical

23   treatment while in custody serving his sentence, and

24   we believe that would be wholly appropriate.

25             So, Your Honor, for all of these

1    reasons, we recommend a custody sentence within the

2    guideline range, and recommend at the high end of the

3    guideline range because of the nature and

4    circumstances of this case.

5              They showed planning, they showed

6    manipulation, and they violated this young girl.  To

7    the extent that other crimes may carry other

8    sentences, such as statutory rape or sexual assault,

9    those are other crimes.  The guidelines which are

10   applied here, apply to the acts which Mr. Shaman did,

11   as he admitted in his plea agreement, and these

12   guidelines are appropriate for this crime.

13             Congress -- the Sentencing Commission

14   has set those out, Congress has set a maximum of 30

15   years for this crime, and of course, we're not asking

16   for anything near there, but the 30 year maximum

17   certainly indicates the seriousness that Congress has

18   placed upon this kind of violation.

19             So for these reasons, Your Honor, we

20   recommend a custody sentence near the high end of the

21   guidelines.  We also believe the Court should impose

22   some level of fine, although perhaps not as high as

23   the low end of the sentencing defined guidelines.

24             We also ask, Your Honor, that as part

25   of the sentence you formally order the forfeiture of

1    his BMW automobile.  The Court signed the order the

2    other day, but that should be a part of the Court's

3    orally pronounced sentence here today.  Thank you,

4    Your Honor.

5                    THE COURT:  Thank you.  Is there

6    anything further from anyone?

7         (No response)

8                    THE COURT:  Hearing not, I adopt and

9    credit the presentence report, the factual findings

10   and guideline application.  You may declare a ten

11   minute recess.

12                   THE CLERK:  All rise.  We will

13   reconvene at five after 4.

14        (Recessed at 3:54 p.m.; reconvened at 4:48 p.m.)

15                   THE CLERK:  Court is again in session.

16                   THE COURT:  Please be seated.

17                   Will the defendant and his lawyer

18   please rise?

19                   Pursuant to the Sentencing Reform Act

20   of 1994, it is the judgment of the Court that the

21   Defendant, Louay Shaman, is hereby committed to the

22   custody of the Bureau of Prisons, the Federal Bureau

23   of Prisons to be imprisoned for a term of 96 months.

24                   Upon release from imprisonment, the

25   defendant shall be placed on supervised release for a

1    term of ten years.  Within 72 hours of release from

2    the custody of Bureau of Prisons, the defendant shall

3    report in person to the probation office in the

4    district to which the defendant is released.

5                While on supervised release, the

6    defendant shall not commit another federal, state, or

7    local crime, and shall be prohibited from possessing a

8    firearm or other dangerous device, shall not possess

9    an illegal controlled substance, and shall comply with

10   the other standard conditions that have been adopted

11   by this Court.

12               The defendant must submit to one drug

13   test within 15 days of commencement of supervised

14   release, and at least two tests thereafter, as

15   determined by the probation officer.

16               In addition, the defendant shall comply

17   with the following special conditions:  The defendant

18   shall participate in a mental health program for

19   evaluation and/or treatment, and abide by the rules of

20   any such program until satisfactorily discharged.

21               The defendant shall participate in a

22   sex offender treatment program for evaluation and/or

23   treatment, and abide by the rules of any such program

24   until satisfactorily discharged.

25               The defendant shall report to the

1    United States Probation Office any regular contact

2    with children of either sex under the age of 18.  The

3    defendant shall not obtain employment or perform

4    volunteer work which includes regular contact with

5    children under the age of 18.

6              The defendant shall register with the

7    state sex offender registration agency in any state

8    where the defendant resides, is employed, carries on a

9    vocation, or is a student, as directed by the

10   probation officer.

11             The defendant shall cooperate in the

12   collection of DNA as directed by the probation

13   officer, and to any examinations during supervision of

14   the defendant's computer, and any devices, programs,

15   or application.

16             The defendant shall allow the

17   installation of any hardware or software systems which

18   monitor or filter computer use.  The defendant shall

19   abide by the standard conditions of computer

20   monitoring and filtering that will be approved by this

21   Court.

22             The defendant is to pay the cost of the

23   computer monitoring, not to exceed the monthly

24   contractual rate in accordance with the probation

25   officer's discretion.

1    The Court finds that the defendant does

2  not have the ability to pay a fine.  The Court will

3  waive the fine in this case.  It is further ordered

4  that the defendant shall pay to the United States a

5  total special assessment of $100 which shall be due

6  immediately.

7    It is ordered that the defendant shall

8  forfeit to the United States Bureau of Investigation

9  all of his right, title, and interest in one black

10  1999 BMW motor vehicle, Model 528i, Vehicle

11  Information Number WBADM5330XBY15013.

12    The Court has reviewed these conditions

13  of supervision and finds that they are reasonably

14  related to statutory goals, consistent with United

15  States Sentencing Commission Policy, and that the

16  liberty depravations are no greater than is reasonably

17  necessary.

18    This sentence was imposed after

19  consideration of the sentences available, advisory

20  guideline range, and Section 3553 factors because it

21  is consistent with the nature, circumstances, and

22  seriousness of defendant's offense, and defendant's

23  history, characteristics, education, vocational,

24  medical and corrective needs, as well as the need for

25  just and non-disparate punishment, deterrence and

1   protection of the public.  I have considered the

2   defendant's sentencing grounds.

3                Do you understand your sentence, Mr.

4   Shaman?

5                THE DEFENDANT:  Yes, sir.

6                THE COURT:  All right.  You may be

7   seated.

8                Mr. Shaman, under the law, I'm required

9   to state for the record and for your benefit the

10  reasons why I have imposed the sentence I have

11  imposed, and I'm going to do that at this time.

12                I have just sentenced the Defendant,

13  Louay Shaman, in this matter.  Mr. Shaman is a 32-year

14  old individual with the offense for which he has just

15  been sentenced representing his second criminal

16  conviction.

17                Mr. Shaman was sentenced in this matter

18  based on his sexual contact with a 14-year old girl.

19  The defendant and the minor had contact by way of

20  social media outlets for approximately two days before

21  Mr. Shaman traveled from New Jersey to Pennsylvania.

22                He picked up the minor at her home near

23  Allentown, Pennsylvania.  The defendant traveled back

24  to New Jersey with the minor where he had sexual

25  contact with the victim in his automobile in New

1    Jersey.

2              The victim's parents reported her

3    missing and contacted police.  They were able to

4    ascertain Mr. Shaman's phone number and they contacted

5    him.  The police made contact with the defendant and

6    instructed her to bring the minor back to her home

7    immediately.

8              On March 5, 2012, Mr. Shaman drove the

9    minor to the police station in Pennsylvania.  The

10   defendant voluntarily submitted to a buccal swab test.

11   The victim was taken to a local hospital where she

12   underwent numerous tests.  The results of the tests

13   revealed Mr. Shaman's DNA was present on the victim's

14   lower thigh, his sperm was present in the victim's

15   underwear, and other traces were found on the victim's

16   breast.

17             The defendant's conduct in this matter

18   is disturbing, violent, and worthy of a lengthy period

19   of incarceration.  Mr. Shaman was completely aware of

20   what he was doing and who and how old the victim was

21   in this matter.

22             It should be noted that the defendant

23   was unable to provide detailed information regarding

24   his early childhood and adulthood prior to this arrest

25   for the instant offense during his presentence

1    interview.  However, the depth of detail and recall of

2    events was not an issue when he was interviewed by Dr.

3    Christopher Lorah, Ph.D., in connection with the

4    presentence report preparation.

5              Mr. Shaman has limited verifiable

6    employment history.  He has no current or active

7    substance abuse, which needs to be addressed while

8    incarcerated.

9              The defendant has fathered one child.

10   His approximately 2-year old daughter resides with his

11   wife in New Jersey.

12             An important sentencing concern

13   pursuant to Title 18 United States Code Section

14   3553(a)(2)(C), for the Court to consider is the

15   protection of the public and punishment of Louay

16   Shaman.  The need for incarceration in this matter is

17   increased when considering the nature of the offense,

18   the degree of the harm, and the conduct comprised with

19   respect to the counts of conviction.

20             The Court has imposed a sentence that

21   takes into account all of the factors of sentencing,

22   as defined at 18 U.S.C. Section 3553(a).

23   Consideration of the seriousness of the offense, just

24   punishment of the offense, adequate deterrence, the

25   history and characteristics of the defendant, the need

1   to protect the public from further crimes of the

2   defendant, and other correctional treatment for Louay

3   Shaman in a most effective manner.

4               Considering the overwhelming

5   victimization of the 14-year old minor, a sentence at

6   the middle of the guideline range, 96 months was

7   imposed.  The guideline range being based on a total

8   offense level of 29, and a criminal history category

9   of 1, yielding a guideline sentencing range of 87 to

10  108 months; the sentence of 96 months being equivalent

11  to eight years, which is in the middle of the

12  guideline range, which in years computes to a range of

13  7 years plus 3 months to 9 years.

14              The sentence also included 10 years of

15  supervised release following incarceration, and a $100

16  special assessment.  Because I concluded that

17  defendant did not have the financial ability to pay a

18  fine, I did not impose a fine.

19              I did, however, award the mandatory

20  $100 special assessment for a special victim's and

21  witness compensation fund.

22              This sentence affords maximum

23  deterrence to others who would be tempted to commit a

24  similar offense, as well as affording deterrence to

25  this defendant from committing other similar offenses.

1       The sentence also protects the public

2  from further crimes of the defendant for at least as

3  long as he remains incarcerated.

4       Mr. Shaman, when you entered your

5  guilty plea in this matter before me on January 6th,

6  2014, I advised you in considerable detail of your

7  appeal rights, and which of those appeal rights you

8  had given up in your written guilty plea agreement.

9  Do you remember those discussions?

10      THE DEFENDANT:  Yes, Your Honor.

11      THE COURT:  All right.  Now, those are

12 still the appeal rights which you have, and which you

13 gave up in your guilty plea agreement respectively.

14 And because January of 19 -- of 2014 was some time

15 ago, I'm going to re-remind you of those appeal rights

16 at this time.

17      Ordinarily, a defendant can appeal his

18 sentence to this Court and to an appeal court.  A

19 defendant may file both a direct appeal and a

20 collateral appeal from a sentence.  I'm now going to

21 explain to you the appeal rights a defendant

22 ordinarily has, and which of those rights you have

23 given up in your guilty plea agreement.

24      First, we are going to discuss a

25 collateral appeal from your sentence, and then we will

1      talk about a direct appeal.

2                      A collateral appeal from a sentence

3      would include the filing of what we call a petition

4      for writ of habeas corpus.  If your federal

5      constitutional rights or other important federal

6      rights are being violated by my sentence, or by your

7      imprisonment, you are permitted ordinarily to file a

8      petition for writ of habeas corpus initially with this

9      Court and thereafter.  If this Court denies your

10     petition, you can appeal it to an appeal court.

11                     This Court is the United States

12     District Court for the Eastern District of

13     Pennsylvania.  The appeal court is the United States

14     Court of Appeals for the Third Circuit, which is

15     located at 601 Market Street in Philadelphia,

16     Pennsylvania.

17                     If either Court agrees with your

18     collateral appeal, the Court may set your sentence

19     aside, reduce it, eliminate it, or modify any illegal

20     or improper or unreasonable conditions of the

21     sentence, or the appeal court could direct me or

22     another judge to resentence you.  And under certain

23     circumstances, you could be released from prison or

24     released early.

25                     Another type of collateral appeal is a

1   petition for post-sentence relief, such as a petition

2   alleging that you were provided ineffective assistance

3   by your counsel.

4               You have stated to me at your guilty

5   plea agreement, that you were satisfied with the

6   services of your counsel, privately retained counsel,

7   David Scott Nenner, and that he had provided you and

8   has provided you with effective assistance as your

9   attorney.  However, if he had not or does not, you can

10  file a collateral appeal from your sentence on those

11  grounds.

12              Now, Mr. Nenner, you were on your feet,

13  was there something you wish to say to the Court?

14              MR. NENNER:  Yes, Judge, and I didn't

15  mean to interrupt, but he's well aware of his

16  appellate rights.

17              THE COURT:  He is indeed, and I'm going

18  to advise him of them --

19              MR. NENNER:  Yes, sir.

20              THE COURT:  -- in full.

21              MR. NENNER:  No problem.

22              THE COURT:  And he will not have any

23  basis on this record to say that he had forgotten them

24  or he didn't understand them at the time.

25              MR. NENNER:  That's why I said that.

1          THE COURT:  All right.  Do you

2   understand those things that I just told you about a

3   collateral appeal, Mr. Shaman?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  All right.  Now, I'm going

6   to tell you about a direct appeal.  In addition to a

7   collateral appeal, you ordinarily also have the right

8   to file a direct appeal from your sentence.  A direct

9   appeal is filed directly with the United States Court

10  of Appeals for the Third Circuit.

11          You do not have to first file it with

12  this court, as you have to do in the case of a

13  collateral appeal.  In a direct appeal from a

14  sentence, you may ordinarily appeal any errors which

15  the Government or I may have committed in your

16  sentencing, and any violations of your federal rights.

17          For example, you may appeal directly if

18  my sentence was higher than authorized by law in any

19  sentencing category.  You may appeal if I imposed an

20  illegal or improper condition of sentence.  You may

21  appeal if my sentence were unreasonable.  You may

22  appeal directly if I failed to calculate the sentence

23  guidelines or calculated them incorrectly, or failed

24  to consider them.

25          Or if I decided to apply the

1    guidelines, as I did, but applied them erroneously.

2    For example, if I were to depart upwards from the

3    sentence guidelines under circumstances not permitted

4    by the guidelines.  You may also appeal directly from

5    my sentence if I or the Government violated any of

6    your rights granted by the United States Constitution,

7    federal statutes, federal appeal court decisions, or

8    federal procedural rules, such as the Federal Rules of

9    Criminal Procedure and the Federal Rules of Evidence

10   to your prejudice in sentencing you.

11              Those are some of the things that you

12   may ordinarily appeal in a direct appeal from my

13   sentence.  Do you understand that?

14              THE DEFENDANT:  Yes, Your Honor.

15              THE COURT:  If the Third Circuit Court

16   of Appeals grants your direct appeal, it could grant

17   you the same relief as you would receive in a

18   successful collateral appeal.  That is, the appeal

19   court could modify your sentence, set your sentence

20   aside, it could order me or another judge to

21   resentence you, eliminate or modify any illegal,

22   improper, or unreasonable conditions of your sentence,

23   and under certain circumstances, the appeal court

24   could release you from prison or release you early.

25   Do you understand those things?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  You have one year from the

3     date your conviction is final to file a collateral

4     appeal.  And you have 14 days from the date your

5     conviction is final to file a direct appeal.  If you

6     miss those deadlines, you may give up forever your

7     right to take those appeals.  Do you understand that?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  A defendant may file both a

10    direct and a collateral appeal from a sentence.  If

11    you do not file a direct appeal, then the one year you

12    have to file a collateral appeal will start from the

13    date I file a document called the judgment of sentence

14    in your case.

15          A judgment of sentence is a document

16    signed by me which will contain the date of your

17    sentence, today's date, March 13, 2015, and the

18    conditions of your sentence.

19          If you do file a direct appeal, then

20    the one year you have to file a collateral appeal

21    begins to run either when the decision of the Third

22    Circuit Court of Appeals becomes final in your direct

23    appeal, or if you appeal further to the United States

24    Supreme Court, when the Supreme Court's decision

25    becomes final in your direct appeal.

1           The Government is not entitled to file

2      a collateral appeal from a sentence, only the

3      defendant may do that.  But the Government may file a

4      direct appeal, as well as you.  If the Government does

5      file a direct appeal from your sentence, it has 30

6      days in which to do so.  If the Government does file a

7      direct appeal, then your time in which to file a

8      direct appeal is increased from 14 days to a period of

9      14 days after the Government takes its appeal.

10           Do you understand that as well?

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  The time when the clock

13      starts running on the deadlines for you and the

14      Government to file an appeal is when I file, in the

15      Office of the Clerk of Court for this court, the

16      United States District Court for the Eastern District

17      of Pennsylvania, a document called a judgment of

18      sentence.

19           That document is also sometimes

20      referred to as a judgment in a criminal case.  As I

21      told you, this document will be signed by me as your

22      sentencing judge and will contain the date of your

23      sentence, today's date, and will contain all of the

24      terms and conditions of your sentence.

25           Customarily, I filed this document from

1    between a couple of days to a couple of a weeks after

2    your sentence hearing.  When that document is

3    delivered to the Clerk of Court which we call filing,

4    and when it is recorded in the official records of his

5    office, called the docket entries, that starts your

6    time clock running for the period of time in which you

7    and the Government must file your appeals.  Do you

8    understand that?

9                    THE DEFENDANT:  Yes, Your Honor.

10                    THE COURT:  The way you file a direct

11    appeal is by filing a document called a notice of

12    appeal.  This document will state the date of the

13    sentence order from which you are appealing, and the

14    name of the sentencing judge, my name, Judge Gardner.

15                    Even though in a direct appeal you are

16    directly appealing to the Third Circuit Court of

17    Appeals, you must file your notice of appeal with the

18    clerk of this court, the district court, which is the

19    trial court and the sentencing court, not with the

20    clerk of the appeal court.  Do you understand?

21                    THE DEFENDANT:  Yes, Your Honor.

22                    THE COURT:  There are several ways you

23    can file your notice of appeal.  You could file it

24    personally by delivering it to the clerk of court, but

25    you are incarcerated, so you cannot do that.  But you

1      can mail the notice of appeal to the clerk of court.

2      In fact, you can request any adult to file it or mail

3      it for you.  However, you must sign the notice of

4      appeal before it is filed or mailed by you or another

5      adult.  Do you understand?

6                    THE DEFENDANT:  Yes, Your Honor.

7                    THE COURT:  You can request your

8      attorney to file the notice of appeal or mail the

9      notice of appeal for you, or you may request any

10     deputy clerk of this court, including the man sitting

11     in front of me at the computer to file it for you.

12                   And so long as you make the request

13     within the 14 days you have to do, your notice of

14     appeal will both be signed and filed on your behalf by

15     your attorney or by the deputy clerk.  Do you

16     understand that?

17                   THE DEFENDANT:  Yes, Your Honor.

18                   THE COURT:  As I already said, you

19     filed a collateral appeal by filing a document called

20     a petition with the clerk of this court, and you file

21     a direct appeal by filing a notice of appeal with the

22     same official.

23                   In a direct appeal, the Third Circuit

24     Appeal Court will set a deadline for your attorney to

25     prepare and file a brief.  A brief is a written legal

1    document containing all of your reasons and the facts

2    and legal authority for your appeal.  In both your

3    collateral appeal petition and your direct appeal

4    brief, you must state all of the errors and violations

5    of your rights from which you are appealing, and all

6    of the reasons for your appeal, and all other facts

7    and legal authority in support of your appeal.

8              If you leave out any of those things

9    from your petition or brief, or if you fail to file a

10   petition or brief or file it late, you may give up

11   forever your right to rely on those appeal grounds.

12   And as I said earlier, if you miss the time deadlines

13   for appealing, you may give up forever your right to

14   take such appeals.  Do you understand that?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  All defendants have the

17   right to be represented by an attorney in connection

18   with the taking of any appeals from a sentence.  If

19   you can afford the services of a private attorney, you

20   may hire any attorney or attorneys who you wish, so

21   long as those attorneys are properly certified to

22   practice law before the appeal court, and so long as

23   they are in good standing with that court.

24             If you are unable to continue to afford

25   the services of a private attorney, then upon

1     application to the Court, the Court will appoint an

2     attorney to represent you in a direct appeal at no

3     cost to you.  You do not have the right to a court-

4     appointed attorney free in a collateral appeal, only

5     in a direct appeal, unless a hearing is required in

6     connection with your collateral appeal, in which case

7     the Court will appoint an attorney to represent you in

8     your collateral appeal hearing, if you cannot afford

9     to hire a private attorney.  Do you understand that?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  You also have the right to

12     represent yourself in either type of appeal.  Also

13     some attorneys and agencies and Bar associations may

14     be willing to represent you without cost or at a

15     reduced fee.  But you do not have the right to a Court

16     appointed free attorney in a collateral appeal, unless

17     there is a hearing before the Court concerning that

18     appeal.  Do you understand that?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  And if you are poor and

21     unable to pay the customary appeal fees and costs,

22     upon application, the Court will relieve you from

23     those obligations in both a direct appeal and a

24     collateral appeal.  Do you understand those things?

25           THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Those are the appeal rights

2    that a defendant ordinarily has.  In your written

3    guilty plea agreement, however, you have given up some

4    but not all of those appeal rights.  I'm now going to

5    discuss with you which of those appeal rights you are

6    giving up in your guilty plea agreement.

7          In your guilty plea agreement, you have

8    given up entirely your right to file a collateral

9    appeal with one exception.  You may still file a

10   petition for collateral relief under Title 28 United

11   States Code Section 2255, but may only raise a claim

12   that your attorney provided constitutionally

13   ineffective assistance to you.

14         Therefore, even if your federal

15   constitutional rights or other important federal

16   rights were violated by my sentence, or by your

17   imprisonment, you cannot file a petition for writ of

18   habeas corpus or any other type of collateral appeal

19   than the one I just mentioned.

20         However, you do not give up the rights

21   to assert any constitutional claims that the relevant

22   case law says cannot be given up.  Do you understand

23   that?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  Concerning a direct appeal,

1    you have given up some but not all of your appeal

2    rights in your guilty plea agreement.  The Government,

3    as I had said, may file a direct appeal, and if it

4    does so, you too may file a direct appeal without

5    limit in the kinds of things that any defendant can

6    raise in a direct appeal, including those things I

7    have just gone over with you.  Do you understand that?

8                    THE DEFENDANT:  Yes, Your Honor.

9                    THE COURT:  If, however, the Government

10   does not file a direct appeal, then your ability to

11   file a direct appeal is severely restricted by your

12   guilty plea agreement.  You will still be permitted to

13   take a direct appeal on three grounds, whether or not

14   the Government takes a direct appeal, but you will

15   give up all the other grounds for a direct appeal,

16   that you would otherwise have as a defendant, because

17   of the terms of your guilty plea agreement.

18                    These matters concerning the rights

19   which you are giving up on appeal are covered in

20   paragraph 12 of your written guilty plea agreement on

21   pages 6 and 7 of that document.

22                    And on page 7, the three matters which

23   you will be permitted to appeal directly no matter

24   what the Government does concerning an appeal are

25   listed.  Whether the Government appeals or not, you

1    may directly appeal my sentence on any count of

2    conviction if the sentence exceeds the statutory

3    maximum for that count. Do you understand that?

4              THE DEFENDANT: Yes, Your Honor.

5              THE COURT: Second, you may appeal

6    directly no matter what the Government does concerning

7    an appeal, challenging a decision by me to impose an

8    upward departure pursuant to the sentence guidelines.

9    Do you understand that?

10            THE DEFENDANT: Yes, Your Honor.

11            THE COURT: Third and finally, you may

12    appeal directly no matter what the Government does

13    concerning an appeal, challenging a decision by me to

14    impose an upward variance above the final sentence

15    guideline range determined by the Court. Do you

16    understand that as well?

17            THE DEFENDANT: Yes, Your Honor.

18            THE COURT: But those are the only

19    three things that you can appeal directly if the

20    Government itself does not appeal. You cannot appeal

21    anything else if the Government does not appeal

22    directly.

23            Now, you may still appeal collaterally

24    one thing only, and that would be if your attorney was

25    not providing you or had not provided you with

1    effective assistance as your lawyer, as I said

2    earlier.

3            Do you understand all of those things

4    about your appeal rights?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  Do you have any questions

7    at this time about either your appeal rights or my

8    sentence?

9            THE DEFENDANT:  No, Your Honor.

10           THE COURT:  If you have any questions

11    about either of those things, ask your attorney, and

12    if you are thinking about taking an appeal, talk to

13    Attorney Nenner promptly, because as I said, you may

14    have as little as 14 days in which to take an appeal.

15    Do you understand that?

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  Do counsel agree that I

18    have correctly and completely advised the defendant of

19    his appeal rights and which of those rights he has

20    given up in his guilty plea agreement?

21           MR. NENNER:  Yes, Your Honor.

22           MR. GLENN:  Yes, Your Honor.

23           THE COURT:  Does either counsel wish

24    that or request that I modify, change, omit, add, or

25    correct anything in the colloquy?

1                    MR. NENNER:  No, sir.

2                    MR. GLENN:  No, Your Honor.

3                    THE COURT:  All right.  Is there

4      anything else to come before the Court at this time

5      concerning the sentence of Louay Shaman?

6                    MR. GLENN:  Yes, Your Honor.

7                    THE COURT:  All right.  And what is

8      that?

9                    MR. GLENN:  The defendant made a motion

10     for a downward departure.

11                   THE COURT:  Oh, thank you for reminding

12     me of that.  I will address that.

13                   As I indicated earlier today and

14     earlier this afternoon in this hearing, the defendant

15     filed a motion for downward departure and/or downward

16     variance and an accompanying sentencing memorandum.

17     It was dated and filed two days ago on March 11, 2015.

18                   As is perhaps apparent from my

19     sentence, but to make it clear, I denied the

20     defendant's motion for downward departure and/or

21     downward variance, and imposed a sentence guideline

22     range sentence upon the defendant.

23                   Having considered the matters contained

24     in the presentence report and the matters argued by

25     counsel at the sentencing hearing today, I concluded

1    that the defendant's request for a downward departure

2    from the sentence guidelines pursuant to Guideline

3    Section 5(k) 2.10 was inappropriate, and that that

4    guideline section is not applicable to the facts of

5    this case.

6              That section refers to a victim

7    contributing to the offense, and according to the

8    guidelines, Section 5(k) 2.10 generally will not be

9    applicable in a non-violent offense.  And I consider

10   this offense to be a non-violent offense.

11             And I therefore have rejected the

12   defendant's request for a downward guideline

13   departure, because I know of no other section of the

14   guidelines that would apply here.

15             The defendant also made arguments which

16   could apply to his request for a downward variance

17   concerning what, in effect, amounted to a

18   characterization by defense counsel of mitigating

19   circumstances.

20             The childhood experiences of the

21   defendant, his psychological condition, and other

22   things that appear on the record concerning the

23   defendant's position at sentencing as articulated by

24   his attorney in defense counsel's sentencing

25   statement.

1               The mitigation argument also sounded a

2        bit like the defendant was blaming the victim for the

3        crime that he committed here.  And I agree with the

4        Government that the facts of this case where the

5        defendant had a desire to have sex with a 14-year old

6        female, and picked her up, drove from New Jersey to

7        Pennsylvania to pick her up and drove her back to New

8        Jersey where he had sex with her in his automobile

9        does not provide mitigating circumstances, or any

10       other circumstances which would justify a downward

11       variance under the guidelines.

12               As Government's counsel said in his

13       argument, he kissed her, he fondled her, he digitally

14       penetrated her, she had abrasions and bruises, she

15       told the medical people that she never had sex before,

16       and she told the police that she told the defendant

17       she did not want to have sex, although she would not

18       have objected to what she called making out.

19               Regarding the defendant's psychological

20       circumstances, I agreed with the Government that

21       whatever the defendant's childhood, teenaged years may

22       have involved or an automobile accident that he had 18

23       months prior to this incident, on the night of the

24       offense he drove from New Jersey to Pennsylvania and

25       then back to New Jersey again, he picked up the victim

1    in Pennsylvania and then took her to New Jersey.  At

2    that time, he was gainfully employed, and I believe he

3    owned a moving company, and he had employees working

4    for him.  And in the words of Government counsel, on

5    the night of the incident, the defendant was

6    functioning quite well.

7              The Government did not object to my

8    recommending that the defendant get medical and/or

9    psychological treatment, and I indeed did make that a

10   condition of his supervised release portion of his

11   sentence.

12             I believe that the sentence guideline

13   range is appropriate, and applies to the actions of

14   the defendant.  And accordingly, I imposed a guideline

15   range sentence, not a downward variance below the

16   guidelines.

17             Government counsel requested that I

18   impose a fine as part of my sentence, and imposed a

19   sentence at the high end of the guidelines, and

20   requested forfeiture of the defendant's BMW vehicle.

21             I did not impose a fine, because I

22   concluded the defendant did not have the financial

23   ability to pay a fine.  I felt for all the reasons

24   I've just articulated that a sentence in the middle of

25   the guidelines, as opposed as to the high end of the

1   guidelines was the sentence sufficient but not greater

2   than necessary to recognize and be consistent with the

3   sentencing factors contained in Title 18 United States

4   Code Section 3553(a).

5            I agreed with the Government that his

6   BMW car should be forfeited, and I, in fact, had

7   already signed a final order of forfeiture for that

8   vehicle, but as Government counsel correctly asserted,

9   it's required, even though I've signed a forfeiture

10  order already, that I include the same forfeiture as a

11  condition of sentence.  And I have done so.  Those

12  then are the reasons why I have imposed this sentence.

13           Is there anything else to come before

14  the Court at this time concerning the sentencing of

15  Louay Shaman?

16                 MR. GLENN:  No, Your Honor.

17                 MR. NENNER:  No, Your Honor.

18                 THE COURT:  All right.  Then you may

19  adjourn court.

20                 THE CLERK:  All rise.

21  (Proceedings concluded at 5:28 PM)

22                      *  *  *  *  *

23

24

25

CERTIFICATION

1
2
3          I, Sheila G. Orms, certify that the
4     foregoing is a correct transcript from the official
5     electronic sound recording of the proceedings in the
6     above-entitled matter.
7
8     Dated:  March 26, 2015
9
10
11
12     Signature of Approved Transcriber
13
14
15
16
17
18
19
20
21
22
23
24
25